DENNIS, Circuit Judge,
concurring in part and dissenting in part:
I respectfully dissent from the majority’s reasons and conclusion in rejecting Pierce’s Atkins claim, because the procedure the Texas courts used to determine whether Pierce is mentally retarded did not comply with the requirements of constitutional due process. In all other respects consistent with this view, I concur in the majority opinion.
I.
Pierce was found not to be mentally retarded by a state habeas court judge on the basis of an affidavit by the state’s expert, without a live adversarial evidentiary hearing, without an opportunity to testify or call witnesses, and without an opportunity to confront and cross-examine the witness against him. In the state habeas proceedings, Pierce presented the affidavits of three mental retardation experts, Dr. June Kaufman, Dr. Richard Garnett, and Dr. Susana Rosin, who each set forth his or her findings, evaluation and opinion that Pierce is mentally retarded.[1] The state presented the affidavit of its expert, Dr. George Denkowski, which set forth his evaluation and opinion that Pierce is not mentally retarded. Dr. Denkowski’s affidavit also contained his reasons for discounting or disagreeing with the contrary opinions of Pierce’s experts.[2] *218 Pierce requested a contradictory evidentiary hearing. But the state habeas court denied Pierce’s motion and did not seek any further input from Pierce’s experts. Rather, the state court found that Dr. Denkowski presented a “credible affidavit” and, on the basis of that affidavit, decided that Pierce is not mentally retarded.[3] Accordingly, the state habeas trial court held that Pierce is not exempt from the death penalty. On appeal, the TCCA adopted the state habeas trial court’s findings and conclusions.[4]
The federal district habeas court refused to grant Pierce an evidentiary hearing on his Atkins claim, found that the state courts’ rejection of his Atkins claim was not unreasonable under AEDPA, and therefore rejected his petition for federal habeas relief. Pierce v. Quarterman, No. H-07-1561, 2008 WL 4445064, at **13-15 (S.D.Tex. Sept. 26, 2008). In doing so, the district court failed to enforce Pierce’s clearly established constitutional right to procedural due process.
II.
Construing and applying the Eighth Amendment in the light of our “evolving standards of decency,” the Supreme Court in Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), held that the Constitution “ ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender.” Id. (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). In Schriro v. Smith, the Court observed that Atkins stated in clear terms that “ ‘we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences,’ ” 546 U.S. 6, 7, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005) (alterations in original) (quoting Atkins, 536 U.S. at 317, 122 S.Ct. 2242), but also stated that “those measures might, in their application, be subject to constitutional challenge,” id. Thus, under Atkins a person has a substantive right not to be executed if he is mentally retarded, and once he makes a prima facie showing that he is *219 mentally retarded, he is entitled to an adjudication meeting constitutional standards to determine his condition.[5]
“The Fourteenth Amendment’s Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake.” Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005). “A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word ‘liberty,’ or it may arise from an expectation or interest created by state laws or policies.” Id. (citing Vitek v. Jones, 445 U.S. 480, 493-94, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution) & Wolff v. McDonnell, 418 U.S. 539, 556-58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (liberty interest in avoiding withdrawal of state-created system of good-time credits)).
In Vitek, the Court held that, “[bjecause prisoners facing involuntary transfer to a mental hospital are threatened with immediate deprivation of liberty interests and because of the inherent risk of a mistaken transfer,” due process requires procedures similar to those required in parole revocation proceedings. Id. at 495-96, 100 S.Ct. 1254 (citing Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). According to Vitek, the minimum procedures before transferring a prisoner to a mental hospital include the following: (1) “Written notice to the prisoner that a transfer to a mental hospital is being considered”; (2) “A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given”; (3) “An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state”; (4) “An independent decisionmaker”; (5) “A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate”; (6) “[In some instances] [availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own”; and (7) “Effective and timely notice of all the foregoing rights.” Id. at 494-95, 100 S.Ct. 1254; see also Morrissey, 408 U.S. at 489, 92 S.Ct. 2593 (listing elements of due process for parole revocations). If these elements of due process are constitutionally required before a state may revoke a former prisoner’s parole (Morrissey) or involuntarily hospitalize and treat a prisoner for mental illness (Vitek), certainly they are guaranteed to a prisoner who has made a plausible showing of mental retardation before he may be declared mentally fit and eligible for execution.
The Court’s decisions, especially Vitek, Morrissey, and Wolff, clearly indicate that Pierce, who made a prima facie showing that he is mentally retarded, is entitled to have his condition adjudicated in a contradictory evidentiary hearing in which he has an opportunity to present testimony of witnesses and to confront and cross-examine witnesses called by the state. The state courts plainly failed to provide Pierce with these constitutional procedures re *220 quired by due process. Because Pierce’s liberty interest at issue here arises directly from the Constitution itself, and not from an expectation or interest created by state laws or policies, his case invokes the full due process protections established by Vitek and Morrissey and does not call for the additional step of applying the framework established in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[6] Moreover, application of Mathews here serves only to confirm that all of the due process essentials set forth in Morrissey are required in this case. The private interest that will be affected by the official action here, Pierce’s life, is, of course, maximal. The risk of an erroneous deprivation of such an interest through lesser procedures than those established by Morrissey is intolerably great, and the value of requiring additional procedural safeguards is extraordinarily high. Consequently, the government’s interest in avoiding the cost of additional process, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail, is relatively small and does not outweigh the other considerations involved or justify a lesser level of process.[7]
Under AEDPA, a federal court may grant habeas relief only if the state court’s adjudication of the claim on the merits “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States,” or “resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). “When a state court’s adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in 28 U.S.C. § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.” Panetti, 551 U.S. at 953-54, 127 S.Ct. 2842 (citing Wiggins v. Smith, 539 U.S. 510, 527-29, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). “Here, due to the state court’s unreasonable application of [Atkins, Vitek, Morrissey, and Wolff,] the factfinding procedures upon which the court relied were ‘not adequate for reaching reasonably correct results’ or, at a minimum, resulted in a process that appeared to be ‘seriously inadequate for *221 the ascertainment of the truth.’ ” Id. at 954,127 S.Ct. 2842 (quoting Ford, 477 U.S. at 423-24, 106 S.Ct. 2595 (Powell, J., concurring in part and concurring in judgment)).
III.
For these reasons, in my view, the judgment of the federal district court deferring to the state courts’ rulings on Pierce’s mental condition should be vacated and the case should be remanded in part to the district court with directions to consider Pierce’s Atkins claim on the merits in an adversarial evidentiary hearing in accordance with the foregoing due process principles and without deferring to the state courts’ findings.

. Dr. Kaufman, a clinical psychologist, evaluated Pierce in 1990. She administered the Wechsler Adult Intelligence Scale-Revised, the result of which she considered "without question valid.” Dr. Kaufman also noted that Pierce exhibited classic traits of the mentally retarded and pointed to Pierce’s adaptive behavioral issues, observing that he did not think through the consequences of his actions, had gross deficiencies comprehending society's basic value systems and conventions and exhibited extremely poor social judgment in everyday life situations. Against this background and his earlier IQ scores of 74 in 1972 and 1974 and 67 in 1975, Dr. Kaufman concluded that Pierce was mentally retarded at the time of the crime in 1977.
Dr. Garnett submitted an affidavit in support of Pierce’s successive state habeas petition in 2002. Dr. Garnett also opined that Pierce was mentally retarded. He noted that Pierce scored below 75 on seven IQ tests over a period of several years, and that a test score of 81 on the Wechsler Adult Intelligence Scale in 1976 was an outlier and may have had to do with hints from the administrator or the test-retest factor. Further, Dr. Garnett also noted that Pierce had significant adaptive deficits. He pointed out that it was common for a mentally retarded person to respond well to structured settings, such as a prison, as is the case with Pierce, only to revert back to unacceptable or illegal behavior as soon as he is outside of that environment.
Dr. Rosin, a clinical psychologist, evaluated Pierce in support of his state habeas application in 2002. She noted that Pierce’s school records showed a consistent pattern of underachievement and observed that Pierce obtained full scale IQ scores of 69 at age nine and 74 at age twelve, both on the Otis-Lennon Test of Mental Ability, and two scores of 67 and 75 on tests administered in 1975. Dr. Rosin administered the Wechsler Adult Intelligence Scale-Ill, on which Pierce scored an IQ of 70. Dr. Rosin further noted that Pierce had significant deficits in conceptual, social and practical skills, pointing to his long history of problems socializing with others, exercising sound judgment, resisting peer pressure, and learning from past experiences. According to Dr. Rosin, his IQ score and his adaptive deficits placed him in the mildly mentally retarded range.

. Dr. Denkowski reviewed Pierce’s files and evaluated him on death row. He administered the Stanford-Binet Intelligence Scales-Fifth Edition, on which he said Pierce achieved a score of 80. Dr. Denkowski opined that, adjusted for moderate anxiety and mild depression, his score was actually in the 80 to 84 range. Further, Dr. Denkowski opined that, apart from his low academic *218 skills, Pierce did not have significant deficits in adaptive functioning. Dr. Denkowski's affidavit otherwise focused on criticizing the opinions of Pierce's three experts-shielded from any form of response or cross examination.

. The state habeas court completely ignored that the expert witnesses examined Pierce at wide intervals (in one instance over a decade apart) and under differing circumstances, with some having analyzed Pierce and made findings prior to the Supreme Court's decision in Atkins; a wide variety of tests were administered involving varying parameters and substantial nuance and complexity; and the mental health experts sharply disagreed on whether Pierce is mentally retarded and submitted diametrically opposed affidavits. Additionally, the qualifications and integrity of Dr. Denkowski, whose affidavit was the pivotal and exclusive basis for the state trial habeas court’s finding that Pierce was not mentally retarded, are now under close scrutiny and his methods have been recognized to be unreliable by this court, the Texas state courts, and the state licensing authorities. See Hall v. Quarterman, 534 F.3d 365, 371 n. 27 (5th Cir.2008); id. at 376 (Higginbotham, J., concurring in part and dissenting in part); Ex parte Plata, No. 693143-B (351st Dist.Ct. Sept. 28, 2007), aff'd, No. AP-75820, 2008 WL 151296 (Tex.Crim.App. Jan.16, 2008); Tex. State Bd. of Examiners of Psychologists v. Denkowski, XXX-XX-XXXX (Tex. State Office of Admin. Hrgs); Renee Feltz, Cracked, Texas Observer, Jan. 5, 2010, available at http:// www.texasobserver.org/cover-story/cracked (last visited April 11, 2010).

. The only state habeas trial court finding not adopted by the TCCA was its clearly erroneous exclusion of Dr. Garnett’s affidavit on the basis that he was not licensed in Texas and thus ineligible to opine on mental retardation in civil commitments under the Persons with Mental Retardation Act, Tex. Health & Safety Code § 591.003(16).

. See Panetti v. Quarterman, 551 U.S. 930, 934-35, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (“Under Ford, once a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, tire Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition.”).

. Under the Mathews balancing test, we weigh "[flirst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.” Id. at 335, 96 S.Ct. 893.

. It bears emphasis, moreover, that Pierce is one of the few Texas death row inmates who has not been afforded such a full due process hearing in a post-Atkins case. Starting with Ex parte Briseno, 135 S.W.3d 1 (Tex.Crim.App.2004), in which the Texas Court of Criminal Appeals implemented the Supreme Court’s pronouncements in Atkins, the prisoner was granted a live hearing on remand in state trial court to determine whether he was mentally retarded. As Judge Higginbotham observed, "Texas courts quickly found their footing post-Atkins. ... Briseno was also convicted before Atkins but ... received a five-day evidentiary hearing on his post-Atkins habeas claim of mental retardation.” Hall, 534 F.3d at 389 (Higginbotham, J., concurring in part and dissenting in part) (citing Briseno, 135 S.W.3d at 4). Such live hearings have become the norm in Atkins cases in the Texas state courts. See Sarah Gail Tuthill, Comment, The Texas-Size Struggle to Implement Atkins v. Virginia, 14 Tex. Wesleyan L.Rev. 145, 146-47, 166 (2007) (describing the "county-by-county patchwork quilt” of procedural approaches).